J-A02008-21

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN RE: ADOPTION OF D.A.L. | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| APPEAL OF: J.A. | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 948 WDA 2020 |

Appeal from the Order Entered September 1, 2020
In the Court of Common Pleas of Butler County Orphans' Court at No(s):
OA No. 49-2019

BEFORE:  BOWES, J., NICHOLS, J., and McLAUGHLIN, J.

MEMORANDUM BY BOWES, J.:                    **FILED: MARCH 12, 2021**

J.A. ("Mother") appeals the order entered on September 1, 2020, that involuntarily terminated her parental rights to her minor son, D.A.L., pursuant to the Adoption Act.[1] We affirm.

D.A.L. was born in May 2012.  Butler County Children and Youth Services ("CYS") first became involved with the family during 2014 when D.A.L. was adjudicated dependent due to drug abuse by Mother and S.A.L.[2] ("Father").  That adjudication was discharged in 2015, and the family was

_____

[1] While dated August 31, 2020, the order was not filed and entered for purposes of Pa.O.C.R. 4.6(b) until September 1, 2020 upon the docketing of notice.

[2] The orphans' court also terminated the parental rights of S.A.L., who did not appeal or participate in the instant appeal.

reunited. On March 6, 2018, CYS again intervened after it received a report regarding Father's drug use. Specifically, the caseworkers observed a bloody needle and a spoon with suspected heroin in the home. At that time, Mother was incarcerated in the Butler County Prison. D.A.L. was habitually truant and it was expected that he would have to repeat kindergarten.

The juvenile court removed D.A.L. from Father's care and placed him temporarily with a paternal aunt in York County. Soon thereafter, he was placed with a different paternal aunt and uncle, L.D. and R.D. ("Paternal Aunt and Paternal Uncle"), who remained a kinship placement until March 2019, when Paternal Aunt and Paternal Uncle indicated that they were no longer a placement option. Since March 2019, D.A.L. lived with a confidential foster family who is a potential adoptive resource.

The juvenile court adjudicated D.A.L. dependent on March 28, 2018. Mother remained incarcerated with no clear release date. While Mother's visitations with D.A.L. were subject to the Butler County Prison's visitation protocol, her primary reunification objective was to maintain an active role in her son's life.

For the majority of the year, Mother was moderately compliant with the permanency plan insofar as she participated in available prison programs and she regularly mailed correspondence to her son. After her release from prison in March 2019, Mother's objectives were expanded to include demonstrating an ability to satisfy D.A.L.'s needs, providing CYS weekly updates, obtaining

a legal source of income, maintaining appropriate housing, and ensuring that all household members or potential caregivers are drug-free and safe.

On June 13, 2019, CYS filed petitions to involuntarily terminate the parental rights of Mother and Father pursuant to § 2511(a) (1), (2), (5), and (8). By July 12, 2019, Mother had achieved substantial compliance with the permanency plan and had made moderate progress toward alleviating the circumstances which necessitated the original placement. For example, she entered an outpatient drug-treatment program, completed a mental health evaluation, and initiated psychological therapy. Nevertheless, problems persisted regarding Mother's ability to satisfy D.A.L.'s need for safety and stability.

Before the court held the evidentiary hearing on CYS's petitions, L.D. and R.D. reemerged and requested visitation with their nephew. The court consolidated the petition for visitation with CYS's petition to terminate parental rights and scheduled hearings that ultimately took place on December 3, 2019, January 23, 2020, and June 30, 2020.[3] Subsequent to the hearings and the submission of a brief by Mother, the orphans' court issued the underlying order terminating Mother's parental rights and denying

---

[3] Pursuant to the order entered on July 18, 2019, the orphans' court appointed Ronald Thomas, Esquire counsel for D.A.L. **See** CYS Exhibit A, Order Appointing Counsel, 7/18/19. Counsel filed a brief in support of termination.

the motion to resume visitation filed by L.D. and R.D.[4] Mother filed a timely

notice of appeal and as concise statement of errors complained of on appeal

pursuant to Pa.R.A.P. 1925(a)(2)(i) and (b).

She presents the following questions for our review:

I. Whether the evidence in the record is inadequate for the [orphans'] court to have concluded, by clear and convincing evidence, that grounds for involuntary termination of parental rights existed pursuant to 23 Pa.C.S.A. §§ 2511(a)(1), (2), (5), and (8) where Mother unequivocally tested negative in drug screens and maintained safe and stable income and housing arrangements.

II. Whether the [orphans'] court erred in concluding that termination of parental rights was in the best interests of the child, as required by 23 Pa.C.S.A. § 2511(b) where the [orphans'] court failed to cite adequate evidence of record and where there was a significant bond between Mother and [D.A.L.]

Mother's brief at 4.

The following applies to our review of matters involving involuntary

termination of parental rights:

The standard of review in termination of parental rights cases requires appellate courts to accept the findings of fact and credibility determinations of the [orphans'] court if they are supported by the record. If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion. A decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will. The [orphans'] court's decision, however, should not be reversed merely because the record would support a different result. We have previously emphasized our deference to trial courts that often have first-hand observations of the parties spanning multiple hearings.

_____

[4] L.D. and R.D. did not participate in this appeal.

*In re T.S.M.*, 71 A.3d 251, 267 (Pa. 2013) (cleaned up). "The trial court is free to believe all, part, or none of the evidence presented and is likewise free to make all credibility determinations and resolve conflicts in the evidence." *In re M.G. & J.G.*, 855 A.2d 68, 73-74 (Pa.Super. 2004) (citation omitted).

The termination of parental rights is governed by § 2511 of the Adoption Act, 23 Pa.C.S. §§ 2101-2938, and requires a bifurcated analysis of the grounds for termination followed by the needs and welfare of the child.

> Our case law has made clear that under [§] 2511, the court must engage in a bifurcated process prior to terminating parental rights. Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in [§] 2511(a). Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to [§] 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child. One major aspect of the needs and welfare analysis concerns the nature and status of the emotional bond between parent and child, with close attention paid to the effect on the child of permanently severing any such bond.

*In re L.M.*, 923 A.2d 505, 511 (Pa.Super. 2007) (citations omitted). We have defined clear and convincing evidence as that which is so "clear, direct, weighty and convincing as to enable the trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue." *In re C.S.*, 761 A.2d 1197, 1201 (Pa.Super. 2000) (*en banc*) (quoting *Matter of Adoption of Charles E.D.M., II*, 708 A.2d 88, 91 (Pa. 1998)).

At the outset, we address Mother's argument that the orphans' court relied upon facts not of record in concluding that CYS had satisfied its burden

of proof. *See* Mother's brief at 23-24. Specifically, she refers to the court's recitation as to the family's prior history with CYS from 2014 to 2015. *Id*. at 24. She contends:

> The [orphans'] court abused its discretion and erred when it used facts not part of the record in its opinion. In its' [sic] opinion, the [orphans'] court used facts that were not a part of the record for the instant case. This case began on March 6, 2018 when CYS caseworkers investigated a report at Father's trailer. Upon witnessing suspected drug paraphernalia and interviewing Father, CYS detained [D.A.L.]. The record begins on this date. However, the [orphans'] court outlined within its opinion, multiple pages of facts that were not part of this case. Specifically, pages two (2) through five (5) of the court's opinion are not part of the record. These facts refer to a separate case involving this family from [orphans'] court outlined at length facts of that case, and then relied on them in its evaluation of the case at bar. Because this is an abuse of discretion and in legal error, this Court should reverse the [orphans'] court's order terminating Mother's parental rights.

Mother's brief at 23-24.

Mother's argument concerning the orphans' court's reference to the family's prior involvement with CYS in 2014-2015 fails for several reasons. First, contrary to Mother's protestations, the trial court did not invoke any facts relating to the first dependency adjudication to establish the statutory grounds to terminate her parental rights. In reality, the orphans' court simply recounted the family's history with the agency in order to frame the narrative that was relevant to the present determination. Mother's assertion that "[t]his case began on March 6, 2018 when CYS caseworkers investigated a report at Father's trailer" belies her understanding of these child-welfare proceedings and disregards the family's interaction with CYS as far back as 2014. Indeed,

- 6 -

the CYS caseworkers ostensibly would not have been at Father's home on March 6, 2018, but for the agency's prior involvement with the family due to the drug abuse of Mother and Father three years earlier. As this Court has often repeated, the orphan's court "must consider the whole history of a given case[.]" *In Interest of: T.J.J.M.*, 190 A.3d 618, 623 (Pa.Super. 2018) (eschewing the mechanical application of the six-month statutory period outlined in section 2511(a)(1)).

It is evident from the orphans' court's analysis that it only considered Mother's behavior commencing March 2018 in finding that CYS satisfied the statutory grounds to terminate her parental rights. *See* Findings of Fact, Opinion, and Order, 9/1/20, at 21-28. While the orphans' court cited facts in its opinion that related to the family's prior interaction with CYS, the court simply outlined the history of this case and it did not rely upon those facts in reaching its decision to terminate parental rights. Hence, we reject Mother's allegation of error.

Next, we address Mother's substantive challenge to the termination of her parental rights. The orphans' court terminated Mother's parental rights pursuant to 23 Pa.C.S. § 2511(a)(1), (2), (5), (8), and (b). In order to affirm a termination of parental rights, we need only agree with the orphans' court as to any one subsection of § 2511(a), as well as § 2511(b). *See In re B.L.W.*, 843 A.2d 380, 384 (Pa.Super. 2004) (*en banc*). Instantly, the

certified record supports the orphans' court's termination decree pursuant to

§ 2511(a)(2)[5] and (b), which provide, in pertinent part, as follows:

> **(a) General rule.--**The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:
>
> . . . .
>
> (2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.
>
> . . . .
>
> **(b) Other considerations.--**The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent.

23 Pa.C.S. § 2511(a)(2), and (b).

With regard to termination of parental rights pursuant to § 2511(a)(2),

we have indicated:

> In order to terminate parental rights pursuant to 23 Pa.C.S.A. § 2511(a)(2), the following three elements must be met: (1) repeated and continued incapacity, abuse, neglect or refusal; (2)

---

[5] Sections 2511(a)(5) and (a)(8) are not applicable to Mother because she was incarcerated at the time of D.A.L.'s removal from Father's care. ***In re Z.P.***, 994 A.2d 1108, 1121, 1123 n.2 (Pa.Super. 2010) (recognizing termination was not proper under subsections (a)(5) and (a)(8) where parent did not exercise custody when child was removed from care of custodial parent).

such incapacity, abuse, neglect or refusal has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being; and (3) the causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied.

*In re Adoption of M.E.P.*, 825 A.2d 1266, 1272 (Pa.Super. 2003) (citation omitted).  We have stated, "[t]he grounds for termination due to parental incapacity that cannot be remedied are not limited to affirmative misconduct.  To the contrary, those grounds may include acts of refusal as well as incapacity to perform parental duties."  *In re Adoption of C.D.R.*, 111 A.3d 1212, 1216 (Pa.Super. 2015).  Accordingly, "[p]arents are required to make diligent efforts towards the reasonably prompt assumption of full parental responsibilities. . . .  [A] parent's vow to cooperate, after a long period of uncooperativeness regarding the necessity or availability of services, may properly be rejected as untimely or disingenuous."  *In re A.L.D.*, *supra* at 340 (internal quotation marks and citations omitted).

In terminating Mother's parental rights pursuant to § 2511(a)(2), the orphans' court reasoned:

> Mother has not effectively addressed her problems with drugs and alcohol or her mental health.  Mother did not submit to all required drug tests and was dismissed from drug treatment therapy for failure to attend.  Even though Mother then enrolled in another program, the [c]ourt finds Mother's inconsistency in attendance evidences [that] Mother does not understand the importance of remaining drug and alcohol free.  Further, Mother did not successfully complete any portion of her mental health treatment. Mother's continued incapacity in this respect has caused [D.A.L.] to be without essential parental care, control or subsistence necessary for his physical or mental well-being.  Mother's failure to complete the [c]ourt[-o]rdered [s]ervices

within the timeframe set forth clearly shows that she cannot or will not remedy the cause/conditions of placement.

. . . .

The [c]ourt holds that based upon the facts, clear and convincing evidence was presented to allow for a termination as to 23 Pa.C.S.A. § 2511 (a)(2).

Findings of Fact, Opinion, and Order, 9/1/20, at 23-24.

Mother challenges the orphans' court's reliance on her non-compliance with drug and alcohol and mental health treatment. *Id*. at 27-30. Mother suggests that she maintained negative drug screens, corrected her failure to attend screens with the appropriate frequency, and that there were no reported concerns related to drugs and alcohol. *Id*. at 28-29. She contends that she attended drug and alcohol treatment and any absences as to such treatment were due to memory loss resulting from a head injury sustained when she was nineteen years old. *Id*. at 28. She further indicates that she sought new treatment and pursued other avenues with respect to treatment when necessary. *Id*. Mother also asserts that she attended mental health treatment, emphasizing that the treatment reports established her compliance with that component. *Id*. at 29-30. Mother concludes, "The [orphans'] court improperly concluded [she] was not consistent with her drug and alcohol compliance[.]" *Id*. at 29.

Notwithstanding Mother's pronouncements of compliance, a review of the certified record reveals that Mother failed to complete her objectives aimed

- 10 -

at reunification with D.A.L. following her release from incarceration,[6] or address the issues related to safety and lack of protective capacity.

Former CYS caseworker, Tiffany Crotzer, was assigned to the family between March 28, 2018, and February 14, 2020. **See** N.T., 6/30/20, at 5, 45, 70-71. She reported that Mother's objectives upon her release from incarceration in March 2019 included participating in mental health and drug and alcohol evaluations and following treatment recommendations. **Id**. at 58-59. While Mother was frequently confused about her objectives, she managed to obtain employment and appropriate housing, participate in visitations,[7] maintain contact with CYS, and comply with the drug-screen program approximately 30 percent of the time.[8] **Id**. at 16, 19, 21-24, 27, 49-51, 53.

_____

[6] As Mother was released from prison in March 2019, her incarceration does not constitute a continuing incapacity. **See In re Adoption of S.P.**, 47 A.3d 817, 828, 830 (Pa. 2012). ("[I]ncarceration is a factor, and indeed can be a determinative factor, in a court's conclusion that grounds for termination exist under § 2511(a)(2) where the repeated and continued incapacity of a parent due to incarceration has caused the child to be without essential parental care, control or subsistence and that the causes of the incapacity cannot or will not be remedied.").

[7] Due to COVID-19 restrictions, Mother's in-person visitation with D.A.L was suspended from mid-March through the end of May 2020. Although CYS offered Mother virtual visitations during the interim period, Mother did not download Skype until immediately before the in-person visitations resumed. N.T., 6/30/20, at 77-80.

[8] Mother was required to submit two drug screens per week. She complied during nineteen of fifty-nine weeks. During thirty weeks, Mother submitted only one screen, and on ten weeks, five of which were during the COVID-19 restrictions, she failed to submit any drug screens. N.T., 6/30/20, at 22, 75; Mother's Exhibit B.

However, while recognizing Mother's engagement in substance abuse and mental health treatment, Ms. Crotzer confirmed that Mother never completed these objectives. *Id*. at 23-24, 46, 49-51, 57-59. Specifically, when asked about Mother's engagement in services from March of 2019 to June 2019, Ms. Crotzer described Mother's participation as "not so much with the drug and alcohol, and she did not even receive her mental health assessment until May 20 of 2019." *Id*. at 46.

The certified record confirms Mother's attendance problems with respect to both drug and alcohol treatment and her mental health program, problems that Mother admitted during her testimony. *See* N.T., 6/30/20, at 49-50, 104-05; N.T., 1/23/20, at 83, 88-89, 90-91, 100-01. Indeed, Mother was discharged from her initial drug and alcohol treatment program at the Gaiser Addiction Center due to persistent attendance problems. *See* N.T., 1/23/20, at 100. Likewise, despite Mother's assertion that she had addressed her mental health problems, her current mental health therapist testified that Mother had not completed any portion of her treatment plan. N.T., 1/23/20, at 84-85.

Furthermore, neither Ms. Crotzer nor Kristin Caro, the current CYS caseworker, recommended reunification. *Id*. at 5, 45, 55-56, 82-83. Ms. Crotzer identified Mother's lack of protective capacity, as evidenced by her continued devotion to Father despite his drug abuse and possible domestic violence, as raising safety concerns that impeded reunification. *Id*. at 24-26. She explained, "the Agency's biggest concern was [Mother]'s ability to keep

the child safe, and that level of function was diminished, so we had significant concerns about relationships that [Mother] had." *Id*. at 24. She further elucidated,

I would argue the fact that there is a significantly diminished protective capacity when [Mother] is okay with the child being exposed, and I don't know as though it's been addressed consistently with how to enhance that protective capacity of making good choices and not allowing the child to be around such activities. . . ."

*Id*. at 26. Notably, such concerns were echoed by Eric Bernstein, Psy.D., who conducted bonding assessments. Dr. Bernstein testified,

With respect to [Mother], what stood out most was just a lack of familiarity about her son's needs and perhaps appreciation or articulation of appreciation for the impact of her own respective difficulties upon her child. There was a certain level of conveyed entitlement, if you will, that I am the mother, and, therefore, I should have the child without any constructive critical assessment of her own strengths and limitations as a parent or how, for that matter, [D.A.L.] may adjust in her care as compared to in [the foster parents'] care.

I'm also mindful of the -- at least report by [CYS] that there presents a history of domestic violence between the parties, just as I'm aware that the parties denied that ever being the case. So I don't know how to reconcile that issue other than to acknowledge that the parties have a history of legal difficulties, one of which with the father having a simple assault charge in years past. But aside from that, I don't know what -- if that even gives rise to concerns about domestic violence with [Mother] or what have you.

And other than that, both parties have a history of legal difficulties which did raise concerns about their future, to the extent they will again incur legal issues an how will that, if at all, compromise the child's stability should he be placed into their care; and to what degree would the child be at risk should they relapse as well, especially given, at least according to [CYS], that there was considerable drug paraphernalia within the home to which [D.A.L.] was exposed, and that certainly raised alarms, if

- 13 -

that is indeed accurate, about potential risk of his safety and well-being.

N.T., 1/23/20, at 28-29.

Hence, the record substantiates the orphans' court's conclusion that Mother demonstrated a repeated and continued incapacity, abuse, neglect, or refusal to parent that has caused D.A.L. to be without essential parental control or subsistence necessary for her physical and mental well-being. ***See In re Adoption of M.E.P.***, ***supra*** at 1272. While Mother made steps toward maintaining sobriety and addressing her mental health problems, that progress was incomplete and she continues to display a diminished protective capacity, as demonstrated by her son's safety and welfare as subordinate to her relationship with Father and she either cannot or will not remedy this situation. As we discern no abuse of discretion or error of law, we do not disturb the orphans' court's findings.

Having determined that the record supports the orphans' court's analysis under 2511(a), we next determine whether termination was proper under § 2511(b). As to § 2511(b), our Supreme Court has stated as follows:

> [I]f the grounds for termination under subsection (a) are met, a court shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The emotional needs and welfare of the child have been properly interpreted to include intangibles such as love, comfort, security, and stability. . . . [T]he determination of the child's needs and welfare requires consideration of the emotional bonds between the parent and child. The utmost attention should be paid to discerning the effect on the child of permanently severing the parental bond. However, . . . evaluation of a child's bonds is not always an easy task.

***In re T.S.M.***, 71 A.3d at 267 (cleaned up). Essentially, "the extent of any bond analysis . . . necessarily depends on the circumstances of the particular case." ***In re K.Z.S.***, 946 A.2d 753, 762-63 (Pa.Super. 2008) (citation omitted).

When evaluating a parental bond, "[T]he court is not required to use expert testimony. Social workers and caseworkers can offer evaluations as well. Additionally, § 2511(b) does not require a formal bonding evaluation." ***In re Z.P.***, 994 A.2d at 1121 (internal citations omitted).

Moreover,

While a parent's emotional bond with his or her child is a major aspect of the [§] 2511(b) best-interest analysis, it is nonetheless only one of many factors to be considered by the court when determining what is in the best interest of the child.

> [I]n addition to a bond examination, the trial court can equally emphasize the safety needs of the child, and should also consider the intangibles, such as the love, comfort, security, and stability the child might have with the foster parent. . . .

***In re Adoption of C.D.R.***, 111 A.3d at 1219 (quoting ***In re N.A.M.***, 33 A.3d 95, 103 (Pa.Super. 2011)) (quotation marks and citations omitted).

In finding that D.A.L.'s emotional needs and welfare favor termination pursuant to § 2511(b), the orphans' court reasoned as follows:

Dr. Eric Bernstein conducted a bonding assessment for Mother and [D.A.L.], Father and [D.A.L.], and the foster parents and [D.A.L.]. Dr. Bernstein opined that [D.A.L.] has a very strong bond with Father and a significant bond with Mother. Dr. Bernstein further opined that [D.A.L.] will experience a loss if his relationship with Mother, Father, or the foster parents is severed which would need to be addressed through counseling.

- 15 -

Dr. Bernstein raised concerns regarding Mother's history of rebelliousness and difficulty with the law, and Father's lengthy legal history with periods of incarceration and long history of drug abuse, due to the effect those difficulties would have on stability and permanence for [D.A.L.] if [D.A.L.] was reunified with the parents. Dr. Bernstein testified that the foster parents provide the opportunity for [D.A.L.] to have a safe, secure, stable home environment with predictability and they recognize and appreciate his needs.

. . . .

In this case, a bond unquestionably exists between [D.A.L.] and Mother[.] However, the [c]ourt finds neither Mother nor Father are able to offer [D.A.L.] a secure, stable home. Mother['s] . . . unwillingness or inability to remedy the problems that exist cause it to be in the best interests of [D.A.L.] to have parental rights terminated so that [D.A.L.] can have safety, permanency, and stability. The [c]ourt acknowledges that [D.A.L.] is currently in a confidential placement but notes that, since Mother does not have a history of violence, the ideal situation would be for Mother to be permitted to have some contact with [D.A.L.].

The [c]ourt has given primary consideration to the developmental, physical, and emotional needs and welfare of [D.A.L.] and determines that the needs and welfare of [D.A.L.] are best met by the termination of Mother and Father's parental rights. As such, it is in child's best interest that Mother['s] . . . parental rights are terminated.

Findings of Fact, Opinion, and Order, 9/1/20, at 28-30.

Mother argues that the conclusion of the orphans' court is faulty because it failed to conduct an in-depth analysis of the child's needs and welfare. Rather, she maintains, the court offered conclusory statements without citation to evidence with specificity. *See* Mother's brief at 32-33. Further, Mother asserts that the court failed to analyze the bond she shares with D.A.L. to determine the impact of severing it. *Id*. at 33, 35. She contends that the

- 16 -

orphans' court's decision "runs in direct contrast to the evidence presented of the 'significant' and 'important' bond between Mother and Child." *Id*. at 35.

Lastly, Mother challenges the finding that she posed a threat to her son's safety. *Id*. at 35-36. She opines,

> The [orphans'] court baselessly concluded that Mother was unable to offer [D.A.L.] a secure, stable home. Rather, the evidence demonstrated that since Mother's release from incarceration, Mother held suitable housing. She maintained the same home, where she prepared a bedroom for [D.A.L.], therefore her living accommodations show permanency and stability. No evidence suggested Mother posed a safety threat to [D.A.L.], and the [orphans'] court even stated Mother does not have a history of violence and thus should be permitted to have contact with the [D.A.L.]. Therefore, the [orphans'] court's conclusion that Mother cannot provide a secure, stable home or offer [D.A.L.] safety, permanency, or stability is contrary to the evidence and must be reversed on appeal.

*Id*. (cleaned up).

Again, we discern no abuse of discretion. The certified record supports the orphans' court's finding that D.A.L.'s developmental, physical and emotional needs and welfare favor termination of Mother's parental rights pursuant to § 2511(b). As indicated *supra*, neither CYS caseworker who was assigned to the family recommended reunification. N.T., 6/30/20, at 5, 45, 55-56. Indeed, Ms. Crotzer expressly cited safety concerns relating to Mother's relationship with Father and Mother's diminished protective capacity. *Id*. at 24-26. Furthermore, having performed bonding evaluations, Dr. Bernstein reiterated Ms. Crotzer's concerns and highlighted the dangers associated with Mother's sense of parental entitlement. *Id*. at 28-29.

Moreover, D.A.L. has been in his current pre-adoptive foster home, where he is happy and doing well, with his needs satisfied, since March 2019. N.T., 6/30/20, at 30-31, 48-49, 81-82; N.T., 12/3/19, at 77, 79-80. Ms. Crotzer noted D.A.L. was "thriving" in the foster home and described the home as "natural, very comfortable, supportive." N.T., 6/30/20, at 48-49.

Dr. Bernstein recognized that D.A.L. shared bonds with Mother, Father, and the foster parents. N.T., 1/23/20, at 19, 27. Hence, he noted that, regardless of the outcome, D.A.L. would experience some form of loss. *Id.* at 29-30. He testified,

> I think no matter how you decide in this case, [D.A.L.] is well aware enough, at least on some level, that he's going to be negatively impacted, either by the loss of his existing stability and relationship with [his foster parents], or the potential -- or the potential for difficulties if placed in the parents' care should they again incur a relapse or have any issues in their domestic situation.
>
> And if he is placed with [foster parents] permanently, there is going to be the felt loss of his father and mother, depending upon [the foster parents'] decision and/or the [c]ourt's decision about what kind of contact, if any, is going to occur between them and their son in the future. So there is really no good situation that is completely going to shelter the child from this.

*Id*.

Emphasizing the effect of safety and stability on D.A.L.'s needs and welfare, Dr. Bernstein stated, "[The foster parents] provide [D.A.L.] with an opportunity to have a safe, secure, stable home environment with predictability, and they recognize and appreciate his needs and offer him a balance, which I think is imperative as well." *Id*. at 30. Hence, Dr. Bernstein

- 18 -

opined that termination of parental rights serves D.A.L.'s needs and welfare. *Id*. at 78; *see also* CYS Exhibit E at 13.

While Mother may love D.A.L., a parent's own feelings of love and affection for a child, alone, will not preclude termination of parental rights. *See In re Z.P.*, *supra* at 1121. At the time of the conclusion of the hearings, D.A.L. had been in placement for over two years, and is entitled to permanency and stability. As we have stated, a child's life "simply cannot be put on hold in the hope that [a parent] will summon the ability to handle the responsibilities of parenting." *Id*. at 1125.

For all of the foregoing reasons, the orphans' court did not err of abuse its discretion in terminating Mother's parental rights pursuant to 23 Pa.C.S. § 2511(a)(2) and (b).

Order affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 3/12/2021

- 19 -